IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARIO CRAWFORD,                          )
                                         )
            Plaintiff,                   )
                                         )        No. 14 C 1271
v.                                       )
                                         )        Magistrate Judge Sidney I. Schenkier
CAROLYN W. COLVIN,                       )
Acting Commissioner of Social Security,  )
                                         )
            Defendant.                   )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Mario Crawford asks the Court to reverse or remand the final decision of the

Commissioner of Social Security ("Commissioner") denying his application for Supplemental

Security Income ("SSI") (doc. # 18: Pl. Mem. in Support of Sum. J.).[2] The Commissioner has

filed a motion seeking affirmance of the decision (doc. # 25: Comm. Mot. for Sum. J.). For the

following reasons, we deny Mr. Crawford's request for remand and thus grant the

Commissioner's motion to affirm.

## I.

On August 20, 2010, Mr. Crawford applied for SSI, alleging an onset date of January 31,

2006 (R. 146, 150). Mr. Crawford's claim was denied initially on November 15, 2010 (R. 91)

and upon reconsideration on February 28, 2011 (R. 105). He participated in a hearing on March

15, 2012 before Administrative Law Judge ("ALJ") Denise McDuffie Martin (R. 38). Also

---

[1]On March 11, 2013, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 9).

[2]We do not have a record of the plaintiff actually filing a motion for summary judgment. After requesting and obtaining leave to file a memorandum in excess of 15 pages, Mr. Crawford filed that brief. He apparently never filed the formal motion for summary judgment along with it.

appearing and testifying were Sheldon J. Slodki M.D., a medical expert, Grace Gianforte, a vocational expert ("VE"), and Mr. Crawford's mother, Vivian Covington (*Id.*). On March 23, 2012, the ALJ issued a decision finding that Mr. Crawford was not disabled and denying Mr. Crawford's claim for benefits (R. 19). On May 31, 2013, the Appeals Council denied Mr. Crawford's request for review, making the ALJ's ruling the final decision of the Commissioner (R. 6-9). *See* 20 C.F.R. § 404.981; *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We begin with a summary of the administrative record. Part A reviews Mr. Crawford's medical history, Part B reviews the hearing testimony, and Part C summarizes the ALJ's opinion.

## A.

Mr. Crawford was born on August 12, 1974 (R. 161). In his current application for benefits, he alleged an onset date of January 31, 2006 (R.161), but there is no record of medical treatment from that date until November 2009. It is not clear from the record how or why Mr. Crawford chose January 31, 2006 as his alleged onset date. Indeed, the record reflects that he worked several different jobs after that date, well into 2007 (R. 188). That said, it appears that Mr. Crawford amended his alleged onset date to the date of his application, August 20, 2010.[3]

Mr. Crawford is 5'10" tall and during the time period covered by the medical record his weight fluctuated between 215 and 237 pounds (R. 165, 237, 273-76, 296). In 1993, Mr. Crawford was in an automobile accident in which his upper right extremity (arm) was injured so

---

[3]We do not see any document that formally amends Mr. Crawford's alleged onset date. But the record also contains a pre-hearing letter from Mr. Crawford's attorney to the ALJ which notes that it had been "explained to the claimant he is only eligible at most for benefits since the date of application" (R.217). While this statement does not reflect an accurate description of the law, the ALJ and both of the parties treat Mr. Crawford's alleged onset date as the date of his application – August 20, 2010 – as do we for purposes of this opinion.

severely it became nearly unusable (R. 47). He was granted disability benefits in 1993, but they were terminated in 2004 (R. 161).[4]

On November 2, 2009, Mr. Crawford visited family medicine doctor Sandra McGowan, M.D., at the Advocate Medical Group for treatment of asthma and suspected sleep apnea (R. 286).[5] At the appointment, Dr. McGowan discontinued Mr. Crawford's use of the asthma medication Albuterol and substituted a Pro-Air inhaler; she also recommended that he undergo a sleep study (Id.).

Mr. Crawford again visited Dr. McGowan in January 2010, primarily for follow-up treatment for an abscess on his head.[6] The relevant progress note states that also was being seen for an "asthma action plan/Peak Flow," but there is no other mention of asthma or evidence that Mr. Crawford was actually treated for asthma at the appointment (R. 285). Mr. Crawford next visited Advocate Medical Group in May 2010, complaining of back pain lasting more than a year and problems with snoring and gasping when asleep (R. 282). Dr. McGowan prescribed the pain reliever Naproxen and again recommended a sleep study (Id.). The treatment note from a follow-up appointment two weeks later states that Mr. Crawford's "pain [was] better," without any other explanation (R. 280).

On July 12, 2010, Mr. Crawford went to the emergency room at St. James Hospital complaining of back pain, which the treating notes characterize as an "acute exacerbation of chronic low back pain" (R. 228-34). The notes also state that Mr. Crawford had not been taking

---

[4]The ALJ did not question Mr. Crawford about his prior award of benefits or the reason they were terminated. A letter from Mr. Crawford's attorney to the ALJ suggests that Mr. Crawford's benefits were terminated following a period of incarceration (R. 111).

[5]All of the records of Mr. McGowan's treatments at Advocate Medical Group are in the form of short "progress notes." Except where noted, they do not contain narrative information or a medical assessment of Mr. Crawford's complaints.

[6] The medical record does not show when Mr. Crawford was first treated for the head abscess.

his prescription Naproxen but does not reveal why (*Id.*). The emergency department doctor instructed Mr. Crawford to continue taking Naproxen and also prescribed Flexeril, another pain reliever (*Id.*). On July 19, 2010, Mr. Crawford had a follow up appointment related to his sleep apnea and back pain, the sparse notations on the progress notes do not shed light on the results of that visit (R. 278).

On July 15, 2010, Mr. Crawford participated in a sleep study, which was conducted because of Mr. Crawford's "apneas, snoring, gasping and choking during sleep, excessive daytime sleepiness, difficulty staying asleep, not feeling refreshed upon waking, [and being] overweight" (R. 290). The study concluded that Mr. Crawford had moderately severe obstructive sleep apnea (*Id.*). Raj Gupta, M.D., who interpreted the results, recommended that Mr. Crawford return for a second study to be fitted for a CPAP mask[7] and that he "make every effort with diet and exercise to reduce his weight towards a BMI of 25" (*Id.*). Although Mr. Crawford's weight was recorded at most of his other medical visits along with his other vital signs, the record does not suggest that his weight contributed to Mr. Crawford's medical complaints other than his sleep apnea (R. 228, 237, 276, 278, 282). There is no evidence in the record that Mr. Crawford ever underwent a second sleep study or obtained a CPAP machine.

Mr. Crawford had an MRI taken of his lumbar spine on July 22, 2010 (R. 289). It was interpreted by George Hallenbeck, M.D., who judged Mr. Crawford's results as essentially normal except for some minimal facet joint degenerative changes at L5-S1 and a hemangioma in the vertebral body[8] (*Id.*).

---

[7]CPAP stands for "continuous positive airway pressure," and is a machine that uses mild air pressure to keep an airway open. It is often used as a treatment for sleep apnea. https://www.nhlbi.nih.gov/health/health-topics/topics/cpap (visited on July 24, 2015).

[8]A vertebral hemangioma is a common, usually benign tumor of the spine, often detected only incidentally in an MRI taken for other reasons. http://radiopaedia.org/articles/vertebral-haemangioma (visited on July 24, 2015).

The treatment note from Mr. Crawford's follow up visit to Dr. McGowan on July 29, 2010, notes that "Ultram helps" with pain (R. 276). On August 9, 2010, chiropractor John Atis performed an initial examination and evaluation of Mr. Crawford's lower back (R. 245). Mr. Crawford described his pain as sharp, throbbing, and aching, rated his pain as 10 out of 10, and reported that his pain interfered with his ability to sleep, stand, bend, and lie down, and required muscle relaxers to alleviate his symptoms (*Id.*). Dr. Atis took an x-ray of Mr. Crawford's back and interpreted it as showing limited lumbar flexion and limited left lumbar rotation (*Id.*). Dr. Artis further noted that Mr. Crawford was positive for bilaterally straight leg raise,[9] which he opined usually indicates sacroiliac joint lesion (*Id.*).[10] There is no evidence in the record that Mr. Crawford ever visited Dr. Artis again for diagnosis or treatment.

The record does not show that Mr. Crawford sought additional treatment for back pain until March 2011. Prior to that date, on November 2, 2010, Dr. McGowan completed a neurological report concerned only with Mr. Crawford's right arm impairment; as part of her report, Dr. McGowan noted that Mr. Crawford had a normal gait, no tendency to fall or swerve, and no posture or stability problems (R. 254-55). One week later, a non-examining State agency doctor, Virgilio Pilapil, M.D., completed an RFC that diagnosed right upper extremity partial paralysis and back pain (R. 258). Dr. Pilapil opined that Mr. Crawford could lift up to 20 pounds occasionally, and ten pounds frequently, stand and/or walk up to six hours in an eight hour day, sit up to six hours in an eight hour day, occasionally climb, balance, stoop, kneel, crouch or

---

[9]While a "positive" result would indicate that the patient experienced pain or limitation of movement, the test Dr. Artis performed on Mr. Crawford does not fit the description of a typical straight leg raise test. Dr. Artis describes the straight leg raise test as occurring with the patient lying "on one side and pull[ing] the knee of that same side up to the chest, while extending the other thigh." However, research into both traditional orthopedic and chiropractic treatment reveals that the straight leg raise test is performed with the patient lying flat on his back with both legs extended while the practitioner raises one leg at a time up off the bed. http://www.chiropractic-help.com/Straight-leg-raise.html, http://orthoinfo.aaos.org/topic.cfm?topic=a00534 (both visited on July 24, 2015).

[10]The sacroiliac joint (SIJ) is a term used to describe the place where the sacrum and the iliac bones join.

crawl, and should avoid hazardous machinery (R. 260-62).[11] Dr. Pilapil's narrative states that Mr. Crawford's "prior severity of back pain appears to have improved by the time of the above exam" (R. 265). The RFC did not mention Mr. Crawford's weight, asthma, or sleep apnea (*Id.*).

On January 4, 2011, Mr. Crawford visited Dr. McGowan for treatment of an abscess on his head and testing for venereal disease; the treatment note does not mention back pain, asthma, or other issues (R. 271-73). On the same date, Dr. McGowan completed an RFC for Mr. Crawford that diagnosed partial paralysis of his upper right extremity; Dr. Crawford opined that Mr. Crawford's prognosis was "poor" with respect to this diagnosis (R. 267). In addition, under the section on the RFC form asking "if your patient has pain, characterize the nature, location, frequency, precipitating factors, and severity of your patient's pain," Dr. McGowan wrote "lbp [low back pain] and Rt. hand pain" (*Id.*). This is the only mention in the RFC that Mr. Crawford had back pain (*Id.*).

In the RFC, Dr. McGowan indicated by checking boxes that Mr. Crawford could walk one city block without pain, sit for no more than one hour at a time, stand for no more than 20-30 minutes at a time, stand and/or walk for less than two hours in an eight hour workday (R. 267-68). Further, Dr. McGowan stated that Mr. Crawford would have to walk around for ten out of every 30 minutes in a work day, and take unscheduled ten minute breaks every one to two hours due to muscular aches (*Id.*).

On February 24, 2011, upon review of Mr. Crawford's medical history, including the RFC reports from Dr. Pilapil and Dr. McGowan, State agency doctor Vidya Madala, M.D., affirmed the RFC from Dr. Pilapil (R. 295-97). Dr. Madala found no support or reasoning for Dr. McGowan's opinion that Mr. Crawford was unable to walk for more than two hours because Mr.

---

[11]Dr. Pilapil also found that Mr. Crawford had manipulative limitations related to his right arm paralysis, which the parties do not dispute (R. 261).

Crawford had not alleged a worsening of his documented conditions or any new or additional impairments, and had not received additional treatment or hospitalizations since the date of his Dr. Pilapil's November 2010 RFC (*Id.*).

On March 11, 2011, Mr. Crawford visited Dr. McGowan complaining of stomach and back pain; this visit was the first time Mr. Crawford had sought treatment for back problems since his August 2010 chiropractic visit (R. 372). Dr. McGowan's notes reveal that Mr. Crawford said that pain medication helped his pain but that he had run out; she gave Mr. Crawford a prescription for Naproxen (R. 373).

In July 2011, the ALJ sought an additional professional opinion about Mr. Crawford's case from Sai Nimmagadda, M.D. (R. 310). Dr. Nimmagadda reviewed Mr. Crawford's medical records and completed an interrogatory that opined Mr. Crawford could sit for six hours in an eight hour workday and stand and/or walk for four hours in an eight hour workday (R. 312). He also noted that Mr. Crawford could occasionally use his right hand to reach, handle, finger or push/pull but had no similar limitation in his left hand, and could frequently balance, stoop, kneel, craw or crouch (R. 313-14). Dr. Nimmagadda noted that Mr. Crawford's back pain was triggered by walking, standing and prolonged use and was relieved by pain medication (R. 321). He also reviewed and mentioned Mr. Crawford's normal MRI and noted that his asthma symptoms as well as his possible sleep apnea were mild (*Id.*). Overall, Dr. Nimmagadda opined that Mr. Crawford's RFC was at the light level with some additional restrictions related to his upper right extremity, and that but for Mr. Crawford's back pain, his RFC would have been closer to a full light/medium level (*Id.*).

On November 2, 2011 Mr. Crawford visited the St. James Hospital emergency room complaining of severe back pain that rated "10/10" and worsened when he bent over (R. 348-52).

An x-ray of his spine was "unremarkable," and the pain improved following administration of pain medications Torodol and Valium (R. 351, 355). At a follow up appointment a week later with Dr. McGowan, Mr. Crawford reported that the pain worsened when he lay down and that he had difficulty standing (R. 361). Dr. McGowan noted that Mr. Crawford's spine exhibited muscle spasms but showed no tenderness or step deformity, and a neurological exam was normal (R. 362). Further, Mr. Crawford's lumbosacral motion was normal, and such motion did not cause any pain (*Id.*). A straight leg raise test was negative. Dr. McGowan prescribed Toradol as a pain medication (*Id.*).

## B.

At the hearing before the ALJ on March 15, 2012, Mr. Crawford testified that he has had back problems since his 1993 accident but that the pain has gotten worse in the past five years (R. 49). Mr. Crawford testified that he was able to walk or stand for 40 to 45 minutes before his back started to bother him, and that standing and walking make his back pain worse (*Id.*).[12] He also testified that sitting was not a problem, except that he had to adjust himself every 30 minutes or so to account for back pain (R. 52). He has been prescribed Naproxen for back pain, but after the prescription ran out he did not get it refilled because the pain has not been bad and he has been able to manage it with regular Tylenol (R.63).

With respect to his arm injury, Mr. Crawford testified that he could lift five pounds with his right arm, up to his hip area, and 50 pounds with his left arm (R. 52). Mr. Crawford also testified that his mother and son do the chores around the house, such as sweeping, doing the laundry and washing the dishes (R. 54). He is able to use a riding mower to cut the grass and can

---

[12]Mr. Crawford testified that since his accident he has also experienced balance or equilibrium problems that affect his ability to stand or walk (R. 50). There is no evidence in the record that Mr. Crawford ever complained of or was treated for equilibrium difficulties. Moreover, all of his neurological testing was normal and Dr. McGowan commented in November 2010 that Mr. Crawford showed no posture or stability problems and had no tendency to fall or swerve (R. 254-55).

make sandwiches and quick meals, although his mother does most of the cooking (R. 53-54). He is also able to take care of his personal hygiene and dress himself, but it takes him a long time to get ready because he has to do everything with his left hand (R. 54-55).

Mr. Crawford testified that he can drive, and usually drives every day to pick up his daughter, to go to a friend's house, or to get something to eat (R. 61). He goes to church, uses the computer to check email and look at various sports websites, and socializes with friends (R. 62). He uses a ProAir inhaler twice a day for his asthma but has not had to visit the hospital for asthma-related health problems in a "long time" (R. 61). Mr. Crawford did not testify to any complaints about sleeping.

The ALJ also called a medical expert ("ME") to testify. Sheldon Slodki, M.D., reviewed Mr. Crawford's medical records and opined that there was no longitudinal treatment record for any of Mr. Crawford's problems (R. 67). He agreed that Mr. Crawford had obvious atrophy in his right arm and probably could use his right arm and hand for less than one-third of the day, but noted that loss of a single, upper extremity, although occupationally important, does not meet the Listing for automatic disability (R. 68). With respect to Mr. Crawford's sleep apnea, Dr. Slodki noted that the record contained no evidence of treatment except for a single sleep study which showed mild, obstructive sleep apnea;[13] he also found no record of emergency room visits, other treatment or mention of attack frequency for Mr. Crawford's asthma (R. 65).

With regard to Mr. Crawford's back pain, Dr. Slodki noted that an MRI showed minimal facet join arthropathy and that Dr. McGowan's neurological report from November 2010 showed that Mr. Crawford had normal leg lift ability and made no mention of back pain (R. 65-68). Dr. Slodki stated that Mr. Crawford's back treatment appeared to be episodic "when he has a flare

---

[13]Mr. Crawford's polysomnography report actually diagnosed his sleep apnea as moderately severe, not mild. The ALJ noted the correct diagnosis in her opinion.

up" and only dated back to 2010. Dr. Slodki explained that he disagreed with the chiropractor's interpretation of a spinal x-ray because the chiropractor had made findings of impairments and nerve damage that were not visible on an x-ray, and because it contained a diagnosis of scoliosis not mentioned anywhere else in the medical record (R. 70).

The ALJ then asked the VE what jobs would be available for an individual of Mr. Crawford's age, education and experience who could perform light work[14] that did not involve more than occasional climbing of ramps and stairs, occasional balancing, stooping, kneeling, crouching and crawling and that did not involve climbing ladders, ropes or scaffolds, use of the right upper extremity or unprotected heights and dangerous moving machinery (R. 73). The VE testified that such an individual could work in various positions defined as "light SVP2 unskilled," and such available positions included school bus monitor, counter clerk, information clerk, and restaurant host (R. 74).

When questioned by the claimant's attorney, the VE testified that with respect to these jobs, if the hypothetical individual would need to sit for 15 to 20 minutes after standing for an hour, he would not be able to work at the light level (R. 74). And, if the hypothetical individual had weekly episodic back pain affecting his ability to stand and walk throughout the day, that individual would need a sympathetic employer (R. 75). Finally, the VE testified that, with respect to unskilled sedentary jobs, she believed there was a ruling indicating that the vast majority of such positions require an individual to use both hands (*Id.*).

---

[14]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.   http://www.ssa.gov/OP_Home/cfr20/404/404-1567.htm (visited on August 3, 2015). The regulations state that the ability to do a full range of light work assumes the ability to also perform sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. In this case, the VE testified that he believed there was a regulation that required the full use of both hands for unskilled, sedentary work (R. 37). While the plaintiff implies that Mr. Crawford's right arm impairment precluded all sedentary jobs, during the hearing, neither the ALJ nor the parties explored whether there were certain sedentary jobs Mr. Crawford could perform, nor have the parties raised the issue in the briefs in this case.

## C.

On March 23, 2012, the ALJ issued an 11-page written decision finding Mr. Crawford not disabled and denying him benefits (R. 22-32). The ALJ applied the familiar five-step process for determining disability, which requires him or her to evaluate sequentially: (1) whether the claimant has engaged in any "substantial gainful activity" since the alleged disability onset date; (2) if his impairment or combination of impairments is severe; (3) whether the severe impairments meet or medically equal any impairment listed in Appendix 1 of the regulations, and, if not, what RFC the claimant possesses; (4) whether that RFC prevents a claimant from performing past relevant work; and, if so, (5) whether his RFC prevents him from performing any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a).[15]

At Step 1, the ALJ determined that Mr. Crawford had not engaged in any substantial gainful employment since August 20, 2010 (R. 24). Next, at Step 2, the ALJ found that Mr. Crawford's severe impairments were lower back pain and right arm impairment due to a motor vehicle accident (*Id.*). The ALJ determined Mr. Crawford's sleep apnea and asthma were not severe because the record showed that he had received no treatment for either of them since the alleged onset date of August 2010 (*Id.*). She stated that other impairments were not discussed given their "minimal impact on the claimant's ability to do basic work activity" (R. 24).

At Step 3, the ALJ determined that none of Mr. Crawford's impairments individually or combined met or medically equaled a Listing. With respect to Mr. Crawford's back pain, the ALJ determined that it did not meet Listing 1.04 (disorders of the spine) because there was no

---

[15]The claimant bears the burden of proof at Steps 1 through 4; the burden then shifts to the Commissioner at Step 5. *Decker v. Colvin*, No. 13 C 1732, 2014 WL 6612886 (N.D. Ill. Nov. 18, 2014); *See also Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

"disorder of the spine with compromise of the nerve root or spinal cord, with evidence or nerve root compression characterized by neuro-anatomic distribution of pain, limitation of the spine, motor loss accompanied by sensory or reflex loss, and positive leg raise" (R. 24). Additionally, the ALJ did not find evidence of spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication (R. 25). Further, Mr. Crawford did not meet Listing 1.02 (major dysfunction of a joint) because, despite his inability to use his right arm, the left upper extremity had no limitations and Mr. Crawford was able to perform fine and gross movements effectively as defined by the regulations (*Id.*). Lastly, the ALJ stated that she chose to follow the opinion of testifying medical expert Dr. Slodki that Mr. Crawford did not meet Listings 1.05 (amputation), 11.14 (peripheral neuropathy), 3.10 (sleep-related breathing disorders), and 3.03 (asthma) (*Id.*). The ALJ then determined that Mr. Crawford had the RFC to perform light exertional work, except that he could never climb ladders, ropes, or scaffolds, although he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl (R. 30). In addition, the ALJ determined that Mr. Crawford must avoid all exposure to heights and moving machinery, and that he was unable to use his upper right extremity (*Id.*).

To make her determination, the ALJ reviewed Mr. Crawford's medical history, including his treatment records and reports from his previous medical tests (R. 26). She also reviewed his testimony about his daily activities and his pain and medications, the medical opinions in the record, a number of third-party statements submitted to her,[16] and the testimony of Dr. Slodki (R. 25-26).

---

[16] The ALJ explained that she reviewed all of the letters submitted by Mr. Crawford's friends and family, which indicate that he is much more limited than in the past. She notes that the majority of the letters concern Mr. Crawford's limitations with respect to his right arm, but explains that she also considered descriptions of Mr. Crawford's problems with balance, depression, asthma and other limitations to the extent such impairments were supported by the medical evidence (R. 29).

Specifically, the ALJ noted that Mr. Crawford had received limited medical treatment since his alleged onset date, with the bulk of his treatment (primarily for his upper arm issues) occurring before that date (R. 28). And, even after August 2010 there were gaps in Mr. Crawford's medical treatment; he did not go back to his treating physician at all between November 2010 and January 2011, at which time he saw Dr. McGowan for treatment of a head abscess but made no other complaints (R. 27). Despite the lack of medical evidence, the ALJ recognized Mr. Crawford's ongoing diagnosis of a significant upper right extremity limitation, and explained that her RFC accounted for the fact that Mr. Crawford was unable to use his right arm (*Id.*).

With respect to Mr. Crawford's back pain, the ALJ reviewed Mr. Crawford's x-rays and MRI, both of which were essentially normal, and noted that "conservative treatment" was recommended for his pain, namely in the form of visits to a chiropractor (R. 29). The ALJ summarized the chiropractor's report by referencing Dr. Slodki's testimony that the chiropractor's interpretations were not supported by the rest of the record (*Id.*).[17] She also noted that Mr. Crawford testified that after he ran out of his prescription pain medication, he adequately managed his pain with Tylenol (*Id.*). The ALJ also reasoned that "while Mr. Crawford has some limitations, he continues to engage in a wide array of daily activities," including household chores, driving, using a riding lawn mower, attending church and spending about an hour a day on the internet (R. 26, 28).

When reviewing the medical opinions, ALJ gave "great weight" to the opinion of the state agency physician (Dr. Pilapil) as well as that of the medical expert Dr. Slodki (R. 29). She

---

[17] Although the claimant lists chiropractor Artis's diagnoses in his brief, he neither argues that the ALJ should have assigned some weight to the opinion nor does he address Dr. Slodki's criticisms of the opinion. In any event, the ALJ's minimal treatment of the chiropractor's report was not erroneous because a chiropractor is not an "acceptable medical source" and "cannot offer medical opinions," see 20 C.F.R. § 404.1513(a); S.S.R. 06–3p, *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2013).

gave "some weight" to the opinion of Dr. Nimmagadda's answers to her medical interrogatory, but found that Mr. Crawford had additional limitations to his upper right extremity not noted by that doctor (*Id.*).

Finally, the ALJ give little weight to Dr. McGowan's opinion because her opinion was not supported by the record (R. 29). Specifically, the ALJ noted that Dr. McGowan only diagnosed Mr. Crawford with an upper extremity impairment, which would not affect his ability to sit, stand or walk; Dr. McGowan did not provide any evidence supporting a sitting or standing limitations (*Id.*). With respect to Mr. Crawford's back pain, Dr. McGowan noted that he made such complaints, but she did not provide any clinical findings or objective evidence to support her statements about Mr. Crawford's back pain; instead she based her assessment solely on Mr. Crawford's subjective complaints of pain (R. 29-30). While the ALJ gave Dr. McGowan's opinion little weight, she did accommodate Dr. McGowan's limitations of Mr. Crawford's right upper extremity, as they were consistent with the other evidence in the record (R. 30).

After determining Mr. Crawford's RFC at Step 4, the ALJ determined that Mr. Crawford was not able to perform any past relevant work (R. 30). At Step 5, she adopted the VE's opinion that a claimant with Mr. Crawford's limitations could nevertheless perform the requirements of less than a full range of light exertional work, for which jobs existed in significant numbers in the national economy (R. 30-31).

### III.

"We will review the ALJ's decision deferentially, and will affirm if it is supported by substantial evidence." *Decker v. Colvin*, No. 13 C 1732, 2014 WL 6612886 at *9 (N.D. Ill. Nov. 18, 2014). Substantial evidence is "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Alevras v. Colvin*, No. 13 C 8409, 2015 WL 2149480 at *4

(N.D. Ill. May 6, 2015) (*Schenkier, J.*). The Court will not reweigh evidence or substitute its own judgment for that of the ALJ. *Decker,* 2014 WL 6612886 at *9. In rendering a decision, the ALJ "must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Id.*, quoting *Schmidt v. Barnhart,* 395 F.3d 737, 744 (7th Cir. 2005).

Mr. Crawford seeks reversal or remand of the ALJ's decision on the grounds that she: (1) failed to consider the impact of his obesity in violation of the requirements set forth in Social Security ruling 02-1p; (2) failed to consider plaintiff's obesity, sleep apnea, and asthma in combination with his severe impairments; (3) failed to consider the entirety of the state agency doctor's opinion in violation of SSR 9g6-6p; (4) failed to adequately explain how she weighed plaintiff's treating physician's opinion pursuant to 20 CFR § 416.927; and (5) ignored the VE's testimony that plaintiff could not perform light or sedentary work. For the reasons stated below, we disagree with Mr. Crawford's arguments and find that substantial evidence supported the ALJ's decision.

## A.

The ALJ did not err with respect to consideration of Mr. Crawford's obesity, either alone or in combination with his other impairments. We recognize that SSR 02–1p instructs that "an ALJ should consider the effects of obesity together with the underlying impairments, even if the individual does not claim obesity as an impairment." *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006). However, an ALJ's failure to account for a claimant's obesity in an RFC does not require remand if the claimant does not explain how his obesity exacerbates his impairments or contributes to his inability to work. *Capman v. Colvin*, No. 14 C 3497, 2015 WL 3982131 at *5 (7th Cir. July 1, 2015); *Mueller v. Colvin,* 524 Fed.Appx. 282, 286 (7th Cir. 2013). This is

particularly true when the claimant's weight is not discussed in any detail in the medical record. *Stepp v. Colvin*, No. 14-3163, --WL--, (7th Cir., July 31, 2015).

In this case, Mr. Crawford never raised the issue of his weight or how it affected his ability to perform basic work activities prior to mentioning it in his memorandum in support of remand. The record shows that between November 2009 and November 2011 there is only one direct mention of Mr. Crawford's weight, which Dr. Gupta made as part of his interpretation of Mr. Crawford's sleep study. While Mr. Crawford's weight was recorded along with his other vital signs at his doctor's appointments, there is no other medical opinion or analysis in the record identifying Mr. Crawford's weight as a factor causing or exacerbating any of his physical impairments. Absent any explanation linking Mr. Crawford's weight to his ability to work, the ALJ was not required to account for Mr. Crawford's obesity in his RFC. "We will not make assumptions about the severity or functional effects of obesity combined with other impairments." *Stojakovic v. Colvin*, No. 14-CV-05480, 2015 WL 1966857 at *10 (N.D.Ill., May 1, 2015).[18]

Following the same reasoning, we find that the ALJ also did not err by failing to consider Mr. Crawford's obesity, sleep apnea and asthma in combination with his severe impairments. It is true that an ALJ must consider all the claimant's ailments in combination and may not ignore lines of evidence. *See,* 20 C.F.R.§ 404.1545(a)(2), *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014). However, like with his obesity, Mr. Crawford presented no evidence about how his sleep apnea or asthma affected his ability to work. And, indeed, there is no evidence in the medical

---

[18]To the extent the ALJ should have considered how Mr. Crawford's weight affected his other impairments, we find that she did; the ALJ noted the single mention of Mr. Crawford's weight as it related to one of his impairments, and then explicitly determined that such impairment (sleep apnea) was not severe because Mr. Crawford did not seek any treatment for it (R. 24). Therefore, while the ALJ may not have directly addressed whether Mr. Crawford's weight impacted his other impairments, she implicitly considered it through her discussion of Dr. Gupta's treatment and subsequent determination that it did not justify further restrictions to Mr. Crawford's RFC. *Pepper v. Colvin*, 712 F.3d 351, 364-65 (7th Cir. 2013).

record (or in Mr. Crawford's hearing testimony) of continuing problems with sleep apnea or asthma after his alleged onset date. The ALJ did not err when she failed to account for these impairments in her RFC, either alone, in combination with his obesity or in combination to his back pain and right arm impairment. *Capman,* 2015 WL 3982131 at *5.

**B.**

Next, we find that the ALJ supported her decisions with respect to the weight and consideration she gave the various medical opinions in the record.

The regulations provide that "[a] treating physician's "opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record." 20 C.F.R. § 404.1527(d)(2), *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010). An ALJ may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician, *Dixon v. Massanari,* 270 F.3d 1171, 1178 (7th Cir. 2001), or when the treating physician's opinion is internally inconsistent, *Clifford v. Apfel,* 227 F.3d 863, 871 (7th Cir. 2000), as long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability." *Id.* at 870. Further, when an ALJ declines to give a treating doctor's opinion controlling weight, he or she must still assign a weight to that opinion, taking into account such factors as "the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion. *Campbell v. Astrue,* 627 F.3d 299, 308 (7th Cir. 2010); 20 C.F.R. § 404.1527(d)(2)).

In this case, the ALJ considered opinions from Dr. McGowan (whom the parties agree was Mr. Crawford's treating physician), state agency doctor Dr. Pilapil (as affirmed by Dr. Madala), testifying expert Dr. Slodki, and additional non-examining doctor Dr. Nimmagadda.

We will address each opinion in turn.

The ALJ gave "little weight" to Dr. McGowan's opinion about Mr. Crawford's limitations. In rejecting Dr. McGowan's opinion (which was in the form of "checked boxes" with no narrative), the ALJ first noted that Dr. McGowan's RFC was not supported by the record and then went on to provide specific examples of that lack of support. *Larson v. Astrue* 615 F.3d 744, 750-51 (7th Cir. 2010) (check-box form entitled to be discounted when contradicted by evidence in the record). The analysis incorporates a discussion of most of the Section 404.1527 factors as well, further supporting the ALJ's decision to give Dr. McGowan's opinion little weight.

Specifically, the ALJ noted that Mr. Crawford received little treatment for his back pain after his onset date, and it was primarily through visits to the emergency room. The ALJ also recognized that the only impairment Dr. McGowan ever diagnosed in Mr. Crawford was in his upper right extremity, which would have no bearing on his ability to stand, sit or walk. Not only did Dr. McGowan fail to provide evidence supporting the limitations expressed in her RFC, but the ALJ noted that Dr. McGowan did not provide *any* clinical findings or objective evidence to support any of Mr. Crawford's complaints of back pain (R. 29). Elsewhere in her opinion, the ALJ pointed to the evidence that Mr. Crawford's back x-ray was "unremarkable" and his MRI was essentially normal (R. 27-28), as well as Mr. Crawford's testimony about his daily activities and the fact that his pain was managed with Tylenol (R. 26, 29). We find that the ALJ minimally articulated her reasons for declining to give Dr. McGowan's opinion controlling weight, and also that she adequately supported her reasons for ultimately giving that opinion little weight overall.[19]

[19]Mr. Crawford argues that Dr. McGowan's opinion should be given more weight, in part, because she saw him "approximately a dozen times over a 1.5 year period, starting in May 2010," and because "her findings

Many of the reasons the ALJ gives to find Dr. McGowan's opinion is not entitled to much weight also support her decision to credit the opinions of the testifying medical expert Dr. Slodki and Agency doctor Dr. Pilapil (as affirmed by Dr. Madala). And while the analysis is not neatly located in the section of the decision concerning medical opinions, a review of the entire document reveals the ALJ's thought process.

The core findings in Dr. Slodki's testimony and the agency's doctor's opinion are that Mr. Crawford's various impairments are mild, as shown both by objective medical testing and his sporadic (or in some cases almost non-existent) treatment for his different medical issues. Throughout the opinion, the ALJ continually mentions Mr. Crawford's "limited treatment", his "unremarkable" x-ray and "essentially normal" MRI, "normal" neurological examination, and satisfactory pain management with over-the-counter Tylenol. These findings track those of the medical experts on which she relies for her decision about Mr. Crawford's RFC.[20]

Mr. Crawford's last argument with respect to medical opinion evidence is that the ALJ did not adequately account for the entire opinion of Dr. Nimmagadda, from whom the ALJ requested a medical interrogatory prior to the hearing. The ALJ stated that she gave some weight to the interrogatory response but found a greater upper right extremity limitation than provided therein. Mr. Crawford argues that the ALJ erred by not accounting for the "check boxes" in the

---

remained relatively consistent throughout the course of treatment as his condition gradually became more debilitating" (Pl. Mem. at 15). This is an inaccurate statement of the evidence. In fact, Mr. Crawford saw Dr. McGowan eight times during the relevant time period, and mentioned back pain at only five of those appointments. Notably, at four of those five appointments, Mr. Crawford reported improvements in his pain after taking medication. Further, Dr. McGowan's November 2010 neurological examination of Mr. Crawford revealed no postural or balancing difficulties and opined that Mr. Crawford could walk at least 50 feet at a normal pace. Mr. Crawford did not seek any additional treatment and Dr. McGowan did not see Mr. Crawford again prior to completing her much more restrictive RFC two months later.

[20] For example, the ALJ refers to Dr. Slodki's opinion that there is no longitudinal history of treatment for any of Mr. Crawford's impairments and then specifically mentions Mr. Crawford's limited treatment for back pain, asthma and sleep apnea. With respect to Mr. Crawford's medical tests (an MRI and two x-rays), the ALJ uses Dr. Slodki's testimony to explain that they do not show severe abnormalities and that the chiropractor's opinion to the contrary is not accurate.

interrogatory that opine Mr. Crawford could stand or walk only for up to four hours in an eight-hour day, which is less than required for most light category jobs. 20 C.F.R. § 404.1567(b). We disagree.

As we explained above, the ALJ adequately supported her decision to give the most weight to the opinions of Dr. Pilapil and Dr. Slodki with respect to Mr. Crawford's abilities and limitations. Although Dr. Nimmagadda's "check box" opinion was more restrictive than the RFC from the Commission doctors in assessing how long Mr. Crawford could stand or walk in an eight-hour day, it was not so inconsistent as to constitute an entire line of evidence that the ALJ ignored. It is true that an ALJ may not ignore an entire line of evidence that is contrary to the ruling. *Golembiewski v.* Barnhart, 322 F.3d 912, 917 (7th Cir. 2003). But only "where the claimant presents considerable proof to counter the agency's position" must the ALJ "articulate, at some minimal level, his analysis of the evidence." *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 2003).

In this case, the inconsistency between Dr. Nimmagadda's report and the other medical evidence is not substantial. Although the check boxes indicated more limitations than those suggested by the Agency doctors, the narrative section of Dr. Nimmagadda's report indicates that Mr. Crawford's back pain only served to reduce his RFC from the full light or medium level to a "restricted light" level (R. 321). That assessment is consistent with the ALJ's RFC, which also is light work with some additional restrictions. *Rios v. Colvin*, No. 12 C 6470, 2014 WL 4815083 (N.D. Ill. September 29, 2014) (ALJ was correct to rely on narrative section of RFC form over check-boxes when forming his own RFC opinion and hypothetical to VE).

## C.

Finally, the ALJ did not err in her consideration of the VE's testimony. In forming a hypothetical question to the vocational expert, an ALJ must include all limitations supported by medical evidence in the record. *Steele v. Barnhart,* 290 F.3d 936, 942 (7th Cir.2002). Mr. Crawford argues that the ALJ should have explained why she did not credit the portion of the VE's testimony that was based on a hypothetical posed by Mr. Crawford's attorney which suggested functional limitation in the RFC that, if supported, would preclude him from performing light work. We have already explained what limitations (and abilities) the ALJ found were supported by the medical record, and the ALJ incorporated those limitations into the hypothetical she posed to the VE. That Mr. Crawford's attorney was able to construct a different, more restrictive hypothetical that precluded all light work does not, on its own, demonstrate that Mr. Crawford actually possessed those additional limitations. *Schmidt v. Astrue*, 496 F.3d 833 (7th Cir. 2007) (ALJ need only include in hypothetical to VE those limitations he finds credible). The ALJ did not err when she chose not to discuss the VE's testimony based on restrictions that the ALJ did not find supported by the record.

## CONCLUSION

For the foregoing reasons, we deny Mr. Crawford's request for reversal or remand (doc. #
18), and grant the request of the Commissioner to affirm the denial of benefits (doc. # 25). The
case is terminated.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATED:   August 5, 2015**